**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-00513-PAB-MEH

WILLEM ADAMS,

     Plaintiff,

v.

MODERNAD MEDIA, LLC, a Florida limited
liability company; 7657030 CANADA INC., a
Canadian corporation d/b/a ACQUINITY
INTERACTIVE; WARREN RUSTIN; and
GARRY JONAS

     Defendants.

---

### PLAINTIFF'S FIRST AMENDED COMPLAINT

---

COMES NOW, Plaintiff Willem Adams, and for his First Amended Complaint against the Defendants, states as follows:

### Introduction

1.　　This is an action for damages due to fraudulent misrepresentation, intentional interference with contract, breach of contract and the doctrine of promissory estoppel.

### Jurisdiction

2.　　This action was removed by Defendants from El Paso County District Court pursuant to a claim that this Court has jurisdiction under 28 U.S.C. §1332(a).

### Venue

3.　　Venue is appropriate in the U.S. District Court for the District of Colorado as the services performed by Plaintiff were performed in Colorado, the contracts contemplated performance in Colorado, and Plaintiff suffered injuries in Colorado.

**Parties**

4.      Willem Adams is an individual who resides in Colorado Springs, Colorado.  He is a former employee of Defendant ModernAd Media, and a former employee of Defendant 7657030 CANADA INC., d/b/a Acquinity Interactive.

5.      Defendant ModernAd Media is a Florida limited liability company.  At times relevant to this Complaint, ModernAd Media maintained an office in Colorado Springs, Colorado, and transacted business in El Paso County, Colorado.  At times relevant to this Complaint, ModernAd Media was authorized to do business within the State of Colorado.

6.      Defendant 7657030 CANADA INC., d/b/a Acquinity Interactive (hereafter "Acquinity") is a Canada Corporation doing business in the United States of America.  At times relevant to this Complaint, Acquinity maintained an office in Deerfield Beach, Florida, and employed approximately seven individuals, including Plaintiff, in an office in Colorado Springs, Colorado.  At times relevant to this Complaint, Acquinity routinely engaged in business in El Paso County, Colorado; however, Defendant Acquinity was never authorized by the Colorado Secretary of State to do business in the State of Colorado.

7.      Warren Rustin is an individual who resides in Boca Raton, Florida.  Mr. Rustin is the principal owner of ModernAd Media.

8.      Garry Jonas is an individual who resides in Boca Raton, Florida.  Mr. Jonas is the principal owner of Acquinity, and at times relevant to this Complaint claimed to be the *de facto* owner of ModernAd Media.

**General Allegations**

2

9.     Paragraphs 1 through 8 are incorporated herein by reference.

10.    ModernAd Media is an internet marketing company which provides lead generation services, display advertising, call center solutions, and email, search, and affiliate marketing.

11.    Warren Rustin is the Managing Member of ModernAd Media.

12.    Acquinity is an internet marketing company which provides lead generation services, and email, mobile web, and social media marketing.

13.    Garry Jonas is Director of Acquinity, and supervises the management of the corporation.

14.    Both ModernAd Media and Acquinity used a process called co-registration to generate sales leads for their clients.

15.    Co-registration is an internet-based marketing practice which consists of the process of obtaining the permission to send an individual more information on a topic while the individual is in the process of doing something else at the time the permission is granted.  For example, in the process of registering a piece of software or opening a free email account, an individual is asked to check various boxes asking for more information about the products or services of the company or on a variety of topics.  If the individual checks any of these boxes, he has "co-registered" for something else. Co-registration leads are used to generate website traffic and market products targeted to the interests of the co-registrant.

16.    In late 2008, Warren Rustin was the President of ModernAd Media, and Garry Jonas was employed as ModernAd Media's Chief Executive Officer.

17.     Willem Adams has substantial experience working in the internet marketing industry, and in particular in the areas of co-registration and affiliate marketing.

18.     Due to Mr. Adams's experience and success in his chosen field, his services have been highly sought out by various internet marketing companies.

19.     In December, 2008, Mr. Adams was approached by representatives of ModernAd Media about a position with that company working on co-registration and affiliate marketing.

20.     After negotiations between Mr. Adams and ModernAd Media, Mr. Adams was offered employment with ModernAd Media as the Vice President of Sales, Co-registration, pursuant to the terms of an employment contract.

21.     ModernAd Media induced Mr. Adams to accept employment by promising to pay him on a commission basis, with the amount of the commissions to be agreed upon within sixty days of the commencement of his employment.  Regardless of the commission structure the parties agreed on, the employment agreement called for Mr. Adams to be paid a guaranteed minimum of $20,000 per month.

22.     Based on the standard commissions paid in the co-registration and affiliate marketing field, Mr. Adams believed that any commission agreement he reached with ModernAd Media would result in him earning commissions in an amount that was at least double the guaranteed minimum monthly payment promised in the employment agreement.

23.     In reliance on the promise of a commission agreement that would yield substantially greater income than the guaranteed minimum salary contained in the agreement, Mr. Adams accepted employment with ModernAd Media.

24.     The employment agreement between Mr. Adams and ModernAd Media was executed on December 30, 2008 and contained a three year term of employment that was to run from January 1, 2009 through January 1, 2012.

25.     Following the commencement of his employment with ModernAd Media, and believing that ModernAd Media intended to negotiate a commission plan with him as specified in the employment agreement, Mr. Adams made multiple proposals for the development of the commission plan that was promised in his employment agreement.

26.     Despite his attempts to negotiate a commission plan, ModernAd Media never responded to Mr. Adams, and refused to negotiate a commission plan as promised in the employment agreement.

27.     Upon information and belief, ModernAd Media never intended to negotiate a commission plan with Mr. Adams or pay him a commission, and that the promise of commissions was an empty promise made to induce Mr. Adams to accept employment on terms more favorable to ModernAd Media.

28.     Accordingly, Mr. Adams was never paid on a commission basis during his employment with ModernAd Media.

29.     The employment agreement provides that Mr. Adams's employment could only be terminated for the following reasons:  death, disability, expiration of the term, for cause by the company, without cause by the company, with good reason by the employee, without good reason by the employee, and by mutual agreement of the parties.

30.     By virtue of these terms of the employment agreement, Mr. Adams was not employed by ModernAd Media as an "at-will" employee, and the terms of the

employment agreement governed the rights and liabilities of the parties with respect to a termination of employment.

31.     The employment agreement includes a provision requiring the payment of severance in the event that Mr. Adams's employment is terminated by ModernAd Media "without cause."  Specifically, a termination by the company "without cause" requires the company to pay Mr. Adams the remainder of the compensation for the three year term of employment that remains unpaid at the time of termination.

32.     Additionally, the Agreement includes a provision requiring the payment of "Other Compensation" to Mr. Adams in the event of a sale or change in control of ModernAd Media.  In the event of a sale or change of control of ModernAd Media, Mr. Adams is entitled to receive one percent of the Net Sale Proceeds (in the event of a sale) or one percent of the Total Valuation of the co-registration division of the Company (in the event of a change of control).

33.     The Agreement defines 'sale' and 'change of control' as follows:

> A "Sale" of the Company shall mean the sale or other conveyance of either (y) all or substantially all of the assets of the Company, or (z) one hundred percent (100%) of the issued and outstanding membership units or ownership interests of the Company to one or more persons or entities which are not, as of the date hereof, an affiliate or equity holder of the Company.  A "Change of Control" of the Company shall mean the sale or other conveyance of more than 50% but less than 100% of the issued and outstanding membership units or ownership interests of the Company to one or more persons or entities which are not, as of the date hereof, an affiliate or equity holder of the Company.

34.     In late December, 2010, Mr. Rustin announced to ModernAd Media's clients that he had "recently sold certain assets of ModernAd Media to a group of ModernAd executives that includes our former CEO Gary Jonas, Greg Van Horn and Josh Greenberg. They have formed an internet marketing company named Acquinity

Interactive and will be extremely well positioned to continue to grow and develop your

existing marketing activity. As part of the Acquinity transition, ModernAd Media will no

longer be involved in internet marketing activities."

35.     The "sale" of ModernAd Media's assets occurred through an asset purchase

agreement with ModernAd Media and Mr. Rustin selling certain assets and membership

interests to Acquinity.  Mr. Rustin is identified in the asset purchase agreement as a

party to the agreement who is selling assets and membership interests to Acquinity.

36.     Pursuant to the terms of the asset purchase agreement, ModernAd Media and

Mr. Rustin sold substantially all of ModernAd Media's assets to Acquinity.  Additionally,

ModernAd Media and Mr. Rustin sold more than 50% but less than 100% of the issued

and outstanding membership units or ownership interests of ModernAd Media to

Acquinity.

37.     At the time of the "sale," ModernAd Media was a highly profitable venture that

generated in excess of $10 million in revenue per month.

38.     In fact, from January through June, 2010, the total revenue generated by

ModernAd Media's co-registration division was approximately $32,605,854.

39.     Other divisions of ModernAd Media generated significant revenues as well.

40.     The total revenues generated by ModernAd Media each month greatly exceeded

its expenses, and ModernAd Media regularly made significant profits.

41.     Despite the profitability of ModernAd Media, Mr. Rustin and Mr. Jonas structured

the "sale" to appear as though ModernAd Media was not making any money, and that it

was necessary for Acquinity to assume certain liabilities of ModernAd Media.  By

structuring the "sale" as an assumption of liabilities, Mr. Rustin and Mr. Jonas were able to severely depress the sale price of ModernAd Media's assets and membership units.

42.     Ultimately,the asset purchase agreement between Acquinity and ModernAd Media and Mr. Rustin shows that Acquinity purchased ModernAd Media's assets and membership units for slightly less than $3.2 million.  This amount is significantly less than the true value of the assets and membership units purchased by Acquinity, and is less than 10% of the revenue generated only by ModernAd Media's co-registration division in the first half of 2010.

43.     Upon information and belief, the asset purchase agreement between Acquinity and ModernAd Media and Mr. Rustin does not reflect the true purchase price of the assets and membership units, and that there was other consideration paid by Acquinity to ModernAd Media and Mr. Rustin that is not stated in the asset purchase agreement.

44.     Upon further information and belief, one of the reasons that Mr. Rustin and Mr. Jonas structured the "sale" as they did, and depressed the sale price of ModernAd Media's assets and membership units, was to diminish any liabilities to individuals with a contractual right to share in the profits of the sale or change in control.  Mr. Adams is one such individual who is entitled to receive compensation in the event of a sale or change of control.

45.     Upon further information and belief, Mr. Rustin received one or more substantial payments from Acquinity and/or Mr. Jonas which were additional consideration for the "sale" of ModernAd Media's assets and membership units.  These payment(s) are not included in the asset purchase agreement, and are believed to total an amount that is at least three times the value of the sale price stated in the asset purchase agreement.

46.     When questioned about the transaction, Mr. Jonas described the sale of ModernAd Media's assets and membership units to Acquinity as mere "semantics," and insinuated that the sale was a sham transaction.

47.     Mr. Jonas has further claimed that he manipulated the sale to meet his needs, and that his group's buyout of ModernAd Media's assets and membership units and taking over operations did not constitute a sale as was contemplated in Mr. Adams's employment agreement.

48.     Mr. Jonas told Mr. Adams that the ModernAd Media "sale" is fictitious.

49.     Mr. Jonas also told Mr. Adams that the ModernAd Media "sale" was only real to the degree he (Mr. Jonas) manipulated it to be.

50.     In a conversation with Mr. Adams, Mr. Jonas stated that he (Mr. Jonas) made the decision that it was time for Mr. Rustin to go and that Mr. Rustin could not continue to own a percentage of the business.

51.     Mr. Jonas then told Mr. Adams that he told Mr. Rustin that he would be taken care of.

52.     Mr. Jonas also stated to Mr. Adams that he and Mr. Rustin had a handshake deal related to the ModernAd Media transaction.

53.     Mr. Jonas's statement that Mr. Rustin would be taken care of and that there was a handshake deal indicates that Mr. Rustin would receive compensation for the ModernAd Media transaction that is not identified in the asset purchase agreement.

54.     Despite Mr. Jonas's contention to the contrary, Acquinity's purchase of ModernAd Media's assets and membership units constitutes either a sale or change of

control that triggered Mr. Adams's right to receive either one percent of the net sale proceeds or one percent of the total valuation of the co-registration division.

55.     Mr. Adams has not received any payment associated with the sale or change of control of ModernAd Media.

56.     Although Mr. Rustin announced the "sale" in late December, 2010, the agreement formalizing the "sale" of ModernAd Media's assets was not entered into until Saturday, January 1, 2011.

57.     As a result of the Mr. Rustin's "sale" of assets of ModernAd Media, Mr. Adams's employment with ModernAd Media was terminated on or about January 1, 2011 after the consummation of the transaction.

58.     Prior to the termination of his employment with ModernAd Media, Mr. Adams had fully performed his duties under the employment agreement by working for ModernAd Media.

59.     Pursuant to the unambiguous terms of his employment agreement, Mr. Adams's employment was not terminated by ModernAd Media for "cause."

60.     Under the employment agreement, "cause" for termination is defined as any of the following:

> (i) Company's determination that Employee has materially neglected, failed, or refused to perform any material duties or obligations in or under this Agreement or pursuant to a lawful directive of Company; provided, however, that Company shall have provided Employee with written notice of such neglect, failure or refusal and Employee shall have failed to cure same within 30 days following receipt of such notice; (ii) Employee's material violation of any provision of or obligation under this Agreement; (iii) Employee's conviction for, or entry of a plea of no contest with respect to, any felony, or with respect to another crime that adversely affects or (in the Company's reasonable judgment) may adversely affect the Company or the ability of Employee to perform his Duties under this Agreement;  or (iv) any other act or omission of Employee involving fraud, theft,

misappropriation, dishonesty, disloyalty, or illegality with respect to the Company or any of its Affiliates or customers.

61.     Termination because of the sale of the company's assets is not contained within the enumerated definition of "cause" for termination; therefore, Mr. Adams's employment was not terminated by ModernAd Media for "cause."

62.     Because ModernAd Media did not terminate Mr. Adams's employment for "cause," his employment was terminated "without cause," which triggered ModernAd Media's obligation to pay severance to Mr. Adams in an amount equal to the remainder of the term of the employment agreement.

63.     At the time Mr. Adams's employment was terminated, there was one year remaining in the term of his employment as specified on the employment agreement.

64.     Pursuant to the clear and unambiguous terms of the employment agreement, Mr. Adams was to be paid a severance payment equal to the compensation he would have been paid for the final remaining year of the term of the employment agreement.  Thus, because Mr. Adams's employment was terminated without cause, he is entitled to one year of severance pay at his annual salary of $240,000.

65.     Despite a request to Mr. Rustin that he be paid the severance due to him under the terms of the employment agreement, Mr. Adams has not been paid the severance he is owed.

66.     On September 26, 2011, Mr. Jonas informed Mr. Adams that any claim for severance pay due under the employment agreement between ModernAd Media and Mr. Adams was going to have to "go through" Mr. Jonas.  Mr. Adams understood this statement to mean that Mr. Jonas was claiming responsibility for making decisions on behalf of ModernAd Media with respect to its contractual obligations to third parties.

67.    Following the termination of his employment with ModernAd Media in early January, 2011, Mr. Adams was hired to work for Acquinity as its Vice President of Sales, Co-registration.

68.    The duties Mr. Adams was hired to perform were very similar to the duties he had performed during his employment with ModernAd Media.

69.    At the time he was hired to work as Acquinity's Vice President of Sales, Co-registration, Mr. Adams learned that Acquinity's management team, including Mr. Jonas, Jesse Tomalty, and Scott Modist, were treating him and the other employees in the Colorado Springs office as independent contractors.

70.    Mr. Adams's work was directed, controlled, and monitored by members of Acquinity's management team in Florida.

71.    Mr. Adams worked in an office in Colorado Springs that was leased by Acquinity. Acquinity paid the rent on the Colorado Springs office, furnished the office, and owned the equipment in the office which was provided for the use of the employees working in the office.

72.    Mr. Adams was paid $20,000 per month by Acquinity for his work, plus an additional amount of money to cover the self employment taxes he was required to pay by virtue of Acquinity's claim that he was an independent contractor.

73.    Despite Acquinity's claim that Mr. Adams was an independent contractor, he was treated as an employee in all respects except for his pay.

74.    Mr. Adams worked as Acquinity's Vice President of Sales, Co-registration from January 4, 2011 through October 31, 2011 when his employment was terminated.

75.     Mr. Adams's employment was terminated because of Acquinity's decision to close its Colorado Springs office.

76.     In October, 2011, prior to the termination of his employment, Mr. Adams was approached by representatives of Acquinity, including Garry Jonas and Jesse Tomalty, who informed him that the company would no longer need his services upon the end of the month, but that Acquinity wanted Mr. Adams to work through the end of November as a consultant for Acquinity, and to help with transitions in the business.

77.     In exchange for his agreement to continue working for Acquinity as a consultant, Acquinity, through Mr. Jonas, agreed to pay Mr. Adams at his regular rate of pay through the end of December, 2011.

78.     On or about November 1, 2011, Mr. Adams began working for Acquinity as a consultant.

79.     In his role as a consultant, Mr. Adams continued to perform work for Acquinity as he had been doing in his role as Vice President of Sales, Co-registration.

80.     Additionally, Mr. Adams traveled from Colorado Springs to Florida for meetings with Acquinity employees and management, including Garry Jonas, Greg Van Horn, Jesse Tomalty, and Scott Modist to discuss and plan for internal transitions within Acquinity following the closure of the Colorado Springs office.  Mr. Adams also traveled from Colorado Springs to New York for meetings to help make client transitions, including holding meetings with clients and his counterpart at Acquinity, and making transition plans internally and for his clients.

81.     Mr. Adams was paid in Colorado by Acquinity for some of the work he performed as a consultant pursuant to the oral agreement.

82.     As contemplated by the agreement between Mr. Adams and Acquinity, Mr. Adams worked through the end of November and into early December, 2011 in his role as a consultant for Acquinity.

83.     During that period of time, Mr. Adams devoted his full efforts to his work for Acquinity, and performed all duties that were requested of him, including his former duties as Vice President of Sales, Co-registration, as well as work in furtherance of the transition to follow the closure of the Colorado Springs office.

84.     Mr. Adams would not have continued to provide services for Acquinity if he had not been promised by Garry Jonas that he would be paid through the end of December, 2011 for his services.

85.     By continuing to work for Acquinity as a consultant into early December, 2011, Mr. Adams performed his obligations under the verbal agreement with Acquinity and Mr. Adams performed the services that Acquinity, through Mr. Jonas, had bargained for.

86.     By its terms, performance of the verbal agreement was to be completed within a two month period, and thus performance could be completed within one year.

87.     Mr. Adams relied on Acquinity's promises, made by Mr. Jonas, to pay him through the end of December, 2011, and because of his reliance on those promises, he performed consulting services for Acquinity, he did not seek out other employment opportunities, and he ignored existing business ventures to his detriment.

88.     Acquinity has failed and refused to pay Mr. Adams the $27,692.31 he would have earned if he would have been paid through the end of December, 2011 as was bargained for.

89.    In early December, 2011, Acquinity, through Jesse Tomalty and Scott Modist, requested that Mr. Adams sign a "termination" agreement which included a release of claims, a non-competition provision, and other terms that Mr. Adams considered to be overreaching and objectionable.  This request was made at the behest of Garry Jonas.

90.    The payment of the remaining $27,692.31 due to Mr. Adams was conditioned upon his signing the agreement and assenting to its overreaching and objectionable terms.

91.    At the same time that Acquinity and Mr. Jonas sought that agreement, Acquinity's in-house counsel, Jesse Tomalty, sent Mr. Adams a proposed settlement agreement and release of claims addressed to Mr. Adams claims against ModernAd Media.

92.    Mr. Tomalty purportedly sent the ModernAd Media release in capacity as a private attorney representing ModernAd Media, rather than in his capacity as in-house counsel for Acquinity.

93.    Upon information and belief, Garry Jonas directed Mr. Tomalty to send the ModernAd Media release to Mr. Adams.

94.    Mr. Adams attempted to negotiate the terms of both agreements; however, Mr. Jonas stated that Mr. Adams was required to sign both agreements as presented, or he would not continue to be paid by Acquinity, and he would receive no payment ModernAd Media.

95.    As the terms proposed in both agreements were unacceptable to Mr. Adams, he did not sign either agreement.

96.     Upon Mr. Adams's refusal to sign the termination agreement with Acquinity, Mr. Jonas directed that Acquinity make no further payments to Mr. Adams for his consulting work, despite the fact that Mr. Adams had fully performed his side of the bargain.

97.     Mr. Jonas acted improperly and used improper means to interfere with the contract between Mr. Adams and Acquinity when he conditioned continued payment by Acquinity upon Mr. Adams's signing a document releasing claims against Mr. Jonas and Mr. Rustin.

98.     Mr. Jonas's motive in directing Acquinity employees to cease paying Mr. Adams after Mr. Adams refused to sign the release was not to benefit Acquinity, but rather was intended to further his own interests by obtaining a release of any claims that Mr. Adams might have against him individually.

99.     When Mr. Adams refused to provide the release of claims Mr. Jonas requested, Mr. Jonas's directive that Acquinity cease paying Mr. Adams was motivated by a desire to harm Mr. Adams in reprisal for his refusal to release any claims he had against Mr. Jonas.

100.    Mr. Jonas acted improperly and used improper means to interfere with the contract between Mr. Adams and ModernAd Media when he conditioned performance of the employment agreement's requirement that ModernAd Media pay severance to Mr. Adams upon Mr. Adams's signing a document releasing claims against Mr. Jonas.

101.    When Mr. Adams refused to provide the release of claims Mr. Jonas requested, Mr. Jonas prevented ModernAd Media from performing its obligations to Mr. Adams by directing Jesse Tomalty, who had been acting in dual capacities as an attorney for both Acquinity and ModernAd Media, to cease communications with Mr. Adams about the

payment of the severance obligation.  Mr Jonas's actions in this regard were motivated by a desire to harm Mr. Adams in reprisal for his refusal to release any claims he had against Mr. Jonas.

102.    Defendant Rustin is the owner and managing member of ModernAd Media, and is the alter ego of ModernAd Media for reasons including, but not limited to, the following:

a.      Defendant Rustin comingled ModernAd Media's funds, with his personal funds and assets, and used corporate funds for non-corporate purposes;

b.      The nature and ownership of ModernAd Media facilitated misuse of corporate assets by Defendant Rustin;

c.      Defendant Rustin disregarded the corporate form of ModernAd Media, and used the assets of the entity as a mere extension of his personal bank accounts; and

d.      ModernAd Media was insufficiently capitalized or insured.

103.    The fact that Rustin included himself as a party to the ModernAd Media-Acquinity asset purchase agreement indicates that Rustin operated ModernAd Media as if he were the owner of the corporate assets and also indicates that he commingled his personal assets with the assets of ModernAd Media.

104.    Evidence of the insufficient capitalization of ModernAd Media can be seen from the fact that one division of the company—the co-registration division—generated annualized revenue in excess of $60 million, yet ModernAd Media found itself in a position to sell the great majority of its assets for an assumption of $3.2 million in liabilities.

105.    Mr. Rustin facilitated a sham transaction between himself and Mr. Jonas to allow

Mr. Jonas to assume control of ModernAd Media's assets and significant revenues as

part of a fictitious sale that was also supported by a handshake deal between the two

which guaranteed that Mr. Jonas would take care of Mr. Rustin.  This is evidence that

the nature and ownership of ModernAd Media facilitated misuse of corporate assets by

Mr. Rustin.

106.    Defendant Jonas is the owner and Director of Acquinity, and is the alter ego of

Acquinity for reasons including, but not limited to, the following:

a.      Defendant Jonas comingled Acquinity's funds, with his personal funds and

assets, and used corporate funds for non-corporate purposes;

b.      The nature and ownership of Acquinity facilitated misuse of corporate

assets by Defendant Jonas;

c.      Defendant Jonas disregarded the corporate form of Acquinity, and used

the assets of the entity as a mere extension of his personal bank accounts; and

d.      Acquinity was insufficiently capitalized or insured.

107.    Mr. Jonas used Acquinity as a mere instrumentality for the transaction of his own

affairs.  For example, he used his position as owner of Acquinity to influence Mr.

Adams's pay in an attempt to obtain releases of his own personal liability.

108.    Similarly, Mr. Jonas used Acquinity to perpetrate a fraudulent transaction to gain

control of the assets of ModernAd Media.

109.    Mr. Jonas used Acquinity corporate assets to "take care of" his high school friend

Warren Rustin as part of a handshake deal between the two to facilitate a sham

transaction between them and ModernAd Media and Acquinity.  This is evidence that

the nature and ownership of Acquinity facilitated misuse of corporate assets by Mr. Jonas and that Mr. Jonas used the assets of Acquinity as a mere extension of his personal bank accounts for the benefit of himself and his friend.

**First Cause of Action— Fraudulent Misrepresentation (Against ModernAd Media and Warren Rustin)**

110.   Plaintiff realleges all prior paragraphs and incorporates them herein.

111.   Defendants ModernAd Media and Rustin represented to Mr. Adams that they would negotiate a commission payment structure with him after the commencement of his employment with ModernAd Media.

112.   Defendants ModernAd Media and Rustin's representations to Mr. Adams were material in his decision to go to work for ModernAd Media.

113.   At the time the representation was made to Mr. Adams, Defendants ModernAd Media and Rustin knew the representation was false, as Defendants did not intend to abide by their promise to negotiate a commission payment structure, and did not intend to pay Mr. Adams any commissions in the future.

114.   Defendants ModernAd Media and Rustin made the representation with the intent that Mr. Adams would rely on it and come to work for ModernAd Media.

115.   Mr. Adams reasonably relied on the representation made by Defendants ModernAd Media and Rustin, and went to work for ModernAd Media based on the belief that Defendants would negotiate a commission payment structure with him, and that he would paid commissions in an amount greatly exceeding the salary set forth in the employment agreement.

116.    Defendants ModernAd Media and Rustin's fraudulent misrepresentations concerning the payment of commissions caused Mr. Adams to suffer damages.

### Second Cause of Action— Breach of Contract (Against ModernAd Media and Warren Rustin)

117.    Plaintiff realleges all prior paragraphs and incorporates them herein.

118.    Defendants ModernAd Media and Rustin entered into the written employment agreement with Mr. Adams.

119.    Mr. Adams substantially performed his duties under the employment agreement.

120.    Defendants ModernAd Media and Rustin failed to perform their duties under the employment agreement.

121.    Specifically, Defendants ModernAd Media and Rustin refused to pay Mr. Adams the severance payment due to him at the time of his termination and refused to pay Mr. Adams the compensation due to him because of the sale or change of control of Defendant ModernAd Media.

122.    This breach of contract has caused Mr. Adams to suffer damages, including attorney's fees which are recoverable pursuant to the terms of the employment agreement.

### Third Cause of Action—Breach of Contract (Against Acquinity and Garry Jonas)

123.    Plaintiff realleges all prior paragraphs and incorporates them herein.

124.    This claim is pled alternatively with Plaintiff's Fourth Cause of Action.

125.    Defendants Acquinity and Jonas entered into the verbal employment agreement with Mr. Adams.

20

126.    The agreement called for Mr. Adams to provide consulting services to Acquinity in November and early December, 2011.  In exchange for those services, Acquinity promised to pay Plaintiff his regular monthly wage from November 1, 2011 through December 31, 2011.

127.    Mr. Adams substantially performed his duties under the employment agreement by providing consulting services for Acquinity in November and early December, 2011.

128.    Defendants Acquinity and Jonas failed to perform their duties under the employment agreement.

129.    Specifically, Defendants Acquinity and Jonas refused to pay Mr. Adams the full amount of bargained for compensation after accepting the value of his services.

130.    Defendants Acquinity and Jonas refused to pay Mr. Adams through December 31, 2011.

131.    This breach of contract has caused Mr. Adams to suffer damages in the amount of $27,692.31.

**Fourth Cause of Action— Relief Pursuant to the Doctrine of Promissory Estoppel**

**(Against Acquinity)**

132.    Plaintiff realleges all prior paragraphs and incorporates them herein.

133.    This claim is pled alternatively with Plaintiff's Third Cause of Action.

134.    Defendant Acquinity, through Garry Jonas, made a promise to Mr. Adams to pay him through November and December, 2011 in exchange for his performance of consulting services for Acquinity during that period of time.

135.    Defendant Acquinity should have reasonably expected that the promises made by Mr. Jonas would have induced action or forbearance by Mr. Adams.

136.    Mr. Adams relied on Defendant Acquinity's promises made by Mr. Jonas to his detriment.

137.    Examples of Mr. Adams's detrimental reliance include:

      a.  Working for a salary below what the market would bear for his services;

      b.  Ignoring existing business ventures to devote his time to Acquinity;

      c.  Foregoing work on future business ventures to devote his time to Acquinity;

      d.  Working in a position of reduced or lesser responsibility;

      e.  Foregoing opportunities to find other work.

138.    Mr. Adams suffered damages as a direct and proximate result of Defendant Acquinity's failure to abide by its promises.  Specifically, Mr. Adams was not paid $27,692.31 due to him as payment through December 31, 2011.

139.    The promise made by Defendant Acquinity to Mr. Adams must be enforced to prevent injustice.

**Fifth Cause of Action— Intentional Interference with Contract (Against Garry Jonas)**

140.    Plaintiff realleges all prior paragraphs and incorporates them herein.

141.    Mr. Adams entered into agreements with Defendants ModernAd Media and Acquinity.

142.    Defendant Jonas knew of the existence of these agreements.

143.    Defendant Jonas acted intentionally and improperly to cause ModernAd Media and Acquinity to not perform their obligations under these agreements.

144.    Specifically, Defendant Jonas intentionally manipulated the sale of ModernAd Media to Acquinity so as to purposefully deprive Mr. Adams of compensation due to him in the event of a sale or change of control.  Further, Defendant Jonas interfered with ModernAd Media's agreement to pay severance to Mr. Adams by hijacking the negotiations with a claim that all payments or decisions would "go through" him, and insisting that Mr. Adams sign a release agreement as a condition of payment of money that was unconditionally due to him.

145.    Further, Defendant Jonas intentionally interfered with Mr. Adams's contract with Acquinity by directing Acquinity employees to stop paying Mr. Adams and condition any further payments of money that was unconditionally due to Mr. Adams upon the signing of a release agreement.

146.    This interference caused Mr. Adams to suffer damages.

**Prayer for Relief**

Plaintiff requests the following relief:

a.    Nominal damages;

b.    Economic and compensatory damages;

c.    Consequential damages;

d.    Punitive damages;

e.    Costs;

f.    Attorney's fees as allowed by contract;

g.    Pre- and post-judgment interest at the highest rate allowed by law; and

h.    All other legal or equitable relief to which Plaintiff is entitled.

Respectfully submitted this 10th day of April, 2012.

CORNISH & DELL'OLIO, P.C.


s/Ian D. Kalmanowitz_____
Ian D. Kalmanowitz, # 32379
431 North Cascade Ave.
Colorado Springs, Colorado
Tel. (719) 475 1204
Fax (719) 475 1264
ikalmanowitz@cornishanddellolio.com
Attorneys for the Plaintiff

Plaintiff's Address:
1352 N. El Paso St.
Colorado Springs, CO 80903

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of April, 2012, I electronically filed with the Clerk of Court using the CM/ECF system a true and correct copy of the foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT** was sent by email:

Carla Barrow, Esq.
Carlos de Zayas, Esq.
Peggy Fisher, Esq.
LYDECKER | DIAZ, LLC
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
Tel: (305) 416-3180
Fax: (306) 416-3190
Email:  cmb@lydeckerdiaz.com
        cdz@lydeckerdiaz.com
        pf@lydeckerdiaz.com

Scott C. Sandberg, Esq.
Snell & Wilmer
1200 Seventeenth Street, Suite 1900
Denver, Colorado 80202
Tel: 303.634.2000
Fax: 303.634.2020
Email: ssandberg@swlaw.com


s/Ian Kalmanowitz_____
Ian Kalmanowitz